Case number 18-1350, Vicki Giron v. Tyco Electronics Corporation. Oral argument not to exceed 15 minutes per side. Carol Laubbaum for the appellant. You may proceed. Good morning. I'm Carol Laubbaum on behalf of the plaintiff appellant, Vicki Giron. I would like to reserve two minutes for rebuttal, please. I would like to start out with a discussion of pretext, which has become a key issue in this case. As this court has noticed, pretext is essentially a common-sense inquiry. Did the employer fire the employee for the stated reason or not? Here, Tyco's stated reason for terminating Ms. Giron is her alleged serious behavioral issues. If a jury questions— Excuse me. I'm sorry to interrupt, but can you raise your voice a little bit? I can pretty much hear you, but I'm not sure you can be heard throughout the courtroom. It's pretty soft. Absolutely. Thank you, Judge. So if Ms. Giron's—if a jury question exists as to Ms. Giron's—exists as to pretext, neither Ms. Giron's sex discrimination or public policy wrongful discharge claim should have been dismissed. I want to bullet point some of the evidence of pretext in this case. Can I ask you a question sort of in the broader context first? Sure. The claim, correct or incorrect, from Tyco is that she had relationship problems. She couldn't get along with people at work, essentially. Right. Does she dispute that? She disputes it in large part. She agrees that she could have improved her communication skills. She admits she essentially fell on her sword in dealing with her supervisor, who was giving her so much pushback and difficulty. And she said, yes, I'm going to try to improve. But the evidence really belies that any of these were serious behavioral issues as opposed to— Well, there were a lot of complaints from her coworkers about her attitude and those things, right? Well, the only complaints, Your Honor, came from these male sales managers who were the very same people that were giving her pushback. I get that. But the point is there are these complaints, right? Well, yes and no. They're vague. They're not defined. Nobody ever counseled my client about them. And she disputes that they were serious. She said, I could improve my communication, yes. She knew that her employer thought they were serious because she'd been put on a performance plan. Well, actually, let's look at her performance reviews. That's how I was going to start out talking about pretext. 2013, absolutely adequate, perfect scores on both performance and behavioral objectives. From two different supervisors, she was rated at Tyco Standards. This includes behavior. This happened first with her original supervisor, a director-level person, Ms. Schroeder. And recall, Ms. Schroeder said to her, meets standards on every facet, and she told her, and this is a non-hearsay admission, some of the sales managers have complained about you, but I don't think this is valid. If we were men, we'd be viewed as go-getters and not difficult to work with. Those comments are from a time period that precedes, by several years, her termination, correct? About two years, but subsequently she got another completely meets review. And she's not being supervised by the same person later. Not at the end, not at the end. And also, assuming these statements are admissible, they're just kind of opinions of Ms. Schroeder. They aren't really factual statements about what happened, correct? Well, I think they're based on her observations of what was going on in the department. And remember, the backdrop that all this should be viewed in when a termination decision is based on subjective criteria, you know, teamwork, behaviors, attitude, communication style. This court has counseled that those types of decisions have to be viewed with some suspicion because subjective criteria. It's a little different when she admits to them. Pardon me? It's a little different when she admits to them. But she said, I can improve my communication style, and she worked on that. And let me move to the PIP, because Judge Gibbons, you raised it. She was put on a PIP for alleged behavioral issues. This was an eight-week PIP. Week after week after week, the PIP paperwork says there have been no complaints about plaintiff. This is the same language, the identical language, week after week after week for eight weeks. So the company essentially admits, you had a perfect record on behaviors during this PIP, so what did Tyco do? Tyco extended the PIP for two more weeks, solicited complaints about her, and complaints while Tyco denies soliciting complaints, that's their terminology, not mine. Here's what I don't understand about that. It's really two questions, so I'll ask you a compound question. As far as the extension of this, at least it seems pretty clear that it got extended either because it was the holidays or somebody was gone, so they extended it two more weeks. I didn't see anything that was sinister about that. But the second part of the question is, I don't understand why, if you're on a PIP for bad behavior, asking the people that you work with if the problem has been resolved, what's wrong with that? Okay, let me address the first point, Your Honor. As far as the holidays, when the PIP was set in November, this is uncontested, it was always known that Suraj Elva, her supervisor, was going to be in India for a good portion of the PIP, yet it was set for eight weeks. It wasn't extended because somebody was gone, the time frame was determined in advance, and then they extended it. So she was judged during these eight weeks on performance. The PIP document said no conflicts. Well, there were no conflicts. So her record was perfect, as I said, as her behaviors. So then there's emails going back and forth between HR and Mr. Elva saying, well, we need to solicit complaints. It doesn't say, let's look at feedback, good, bad, or indifferent. So no one complained about her during these eight weeks. And as she was, you know, in danger of succeeding on this PIP, the company decided, well, we've got to get something documented because there was nothing. That may go to establishing that her termination was terribly unfair. It may go to establishing that her employer committed a serious error of judgment. But it really doesn't go to the gender claim. Okay, well, let me discuss the gender claim because I think there's overwhelming evidence from which a jury could decide that her gender was a factor. We've already talked about Ms. Schroeder's admissions. If we were men, we'd be perceived as go-getters. Also, there's no less than five other men at the company that observed and discussed with Ms. Iran this double standard, including a manager by the name of John Hall. They're telling her, why does he treat you differently than all the men in the department? The difference in treatment included excluding her from meetings. These are meetings bearing on her product lines. She's responsible for knowing what's the price. Instead, the men, the sales managers with Mr. Elva, are meeting behind closed doors, excluding her, making decisions, failing to communicate those decisions to her. And then she's left scrambling. Let's assume they treated her badly, I get that. But again, the question is, why is that based on gender? Because he didn't treat any of the men like that. But the question we have to get to is, did any of the men act like she did? There's an individual by the name of Mr. Aiello who's in the record who had both performance and behavioral problems. There's no record. Judge Murphy goes through in his opinion why the comparables that you seek to have us consider are not truly similarly situated. With what part of his analysis do you disagree? You know what, I don't think you need to get to that analysis, because the reality is she establishes her prima facie case because she was replaced by a man. The similarly situated is an alternate variation of the McDonnell-Douglas prima facie case. But if she's also relying on the same evidence to establish her ultimate burden of pretext, then it has to be considered. I mean, it has to be considered again, and you have to get more out of it than simply the prima facie case finding. Okay, well, let me tick through some of the ways she was treated differently than any other men. There were three men that reported to Mr. Elva and Ms. Eron, the only woman that reported to him. They were all allowed to flex their time and come and go as they wanted. Ms. Eron was not. She was not allowed to work from home unlike the men. He would change. Did she occupy the same position they did? Yes. They were all, I think, product managers. They might have had slightly different titles. Not a problem with salespeople. Yes, but they were all direct reports of Mr. Elva. He would change her quotes. You know, she was involved in pricing. If even by a penny he had to micromanage and change her quotes. She testified he did not do this to the men. I just want to make sure I'm getting what you're saying. I don't think the way this works in terms of pretext is you just show times men were treated differently from women. You've got to show was the explanation for the firing pretextual, and that's where comparables come in. So, you know, the prototypical example would be someone had just the same interpersonal problems, went on a PIP, same thing, and everything's the same except they fire the woman but not the man. So that's what has to be relevant in terms of the comparables. Thank you. And I understand. The PIP, there's evidence that this PIP was a sham. The PIP was inextricably linked with her termination. If the PIP is faulty, the termination is faulty. Let me make another comment about the PIP. How can this PIP be a sham if she – the PIP is for behavioral issues. How can we view it as a sham if she admits to these behavioral issues? Although, I mean, I understand she thinks they're not as bad as the company apparently now claims they were, but as Judge Sutton asked you earlier, she admits to it. All right. Well, here's one example. HR manager said, we didn't make a decision to terminate Ms. Eron until well into the PIP or until it was over. There's actually a memo that says we plan to exit Vicki for performance. This is before she was ever put on a PIP. That's compelling evidence from which a jury could at least conclude minimally that it was a foregone conclusion that she was going to be fired. The problem is that all this may show that they treated her harshly. They treated her badly. It was unfair. It was unjust. The reasons were manufactured. But you've got to have something that takes her from the position of an employee who was treated badly to an employee who was treated the way she was because she was a woman. Okay. Well, she received hostility. She got yelled at. She got pulled into regular chew-out meetings with Mr. Alva. He didn't provide her support unlike her previous supervisor. There's a whole – she was just treated differently like anyone else in the office. Now, I don't have a smoking gun. I don't have him making overtly sexist comments. I can tell you he hired 16 people in his career, all men, zero women, and he was dismissive of her from day one, and the record is very clear on that. Price Waterhouse. Can I go back to one of the emails because you rely upon – I think it's two, maybe it's more emails. And the one you mentioned this morning was the one where they used the word complaints. Yes. And what it specifically says is we need to gather specific examples of complaints. The bullets under that that you haven't mentioned then describes, it seems to me, describes what that means, and it says feedback from internal and external customers and feedback from teams. So feedback could be negative in the form of a complaint or feedback could be positive. So were they out gathering feedback or were they out gathering complaints? Well, both of those bullet points, as you pointed out, are subsumed under the complaints. Right. So they were looking for complaints. The point is they had eight weeks to gather complaints. There were zero complaints. Nothing was happening. She was getting along with everyone beautifully, and there's no evidence to the contrary. So that's when the company decided we need to paper this file and get something in writing. And if you look at the statements. So your view is that at the end of a PIP, it's whatever the company has received that counts and that they can't go back at the end of a PIP and ask people how the employee did it. Either they tell the company during the PIP, and people, of course, won't even know about the PIP, or there's a cutoff and you're home free. No, I don't agree with that. I think it just raises a suspicion that this is not on the up and up. If you have a perfect record on a PIP, and then at the very end they decide, you know what, we need to gather more information because no one complains, so let's get some complaints. And if you look at those complaints, they're boilerplate, they're vague, and they're by the very same sales managers, for the most part, that have been complaining about pricing issues and not being allowed to dictate pricing. So I'm out of time, thank you. Just out of curiosity, and I'm not arguing with you, I'm really just more interested. Sure. If there were people that really liked her and thought she did a great job, and they didn't solicit input from them, and there was a group of people that didn't like her because she was abrasive or didn't like her because she was a woman or whatever reason, and they only solicited them, then your argument would make a lot of sense. But is there any evidence in the record that when they gathered these specific examples of complaints, they went only to the legacies that she thinks were out to get her? Your Honor, they went only to the legacies that were a problem. There was an unsolicited complaint that someone on her behalf forwarded, and I've attached it saying how great she's been, and I've got depth testimony from other coworkers. So then the argument should be when it says get feedback from internal and external customers, they didn't actually do that. Absolutely not. Is that your argument? Yes, that's certainly part of it. Thank you, that's what I wanted to know. Thank you. Okay, we'll hear from your adversary. Good morning, judges. My name is Martin Brook. I represent the appellee. I apologize that my voice is not very strong today. I have a cold I've been struggling with, and I left Michigan. It was 60 degrees and rainy, and it's nice and sunny here in Cincinnati, so it's a nice break from that weather. Thank you for listening to our oral argument today. It may have pleased the court. Even taking Planoff's version of what happened is true. Our trial judge was right in finding that Planoff's evidence falls short of the mark, and therefore a summary judgment should be affirmed. Planoff complains that the workplace was difficult for her, full of conflict, because she did not get along with her coworkers, and they did not get along with her. The defendant concluded, after years, that the crux of the problem was Planoff. They gave her opportunities to change. She did not change, and ultimately they terminated her employment. Well, you say that she didn't change. Your colleague argues that she did fine in the PIP and that she actually got the message and she conformed her conduct. What's wrong with that? I think that's inaccurate. The very first week of the PIP document reflects that there was a major conflict  Afterwards, there were no other people that came forward with complaints, but that's not the only thing that the company was relying upon. By the way, Planoff is a productive person. What's the point of a PIP if during the last, I think it was, what, seven weeks? Maybe it was a longer period of time. But anyway, for a number of weeks, there are no problems. It wouldn't seem that that would normally lead to termination. It seems it would lead to a conclusion that the employee, indeed, was conforming her behavior to what the company expected of her. It just doesn't. I mean, the inference that she was still a problem in the workplace doesn't seem supported by the PIP documents. Not in this case, Your Honor. And the reason is that these problems were longstanding problems. Why put her on a PIP as opposed to just not fire her earlier? I mean, if you're going to put somebody on a PIP, if they do find on the PIP, you would expect that that means they're going to keep their job, not that they're going to lose it. I disagree that she was doing fine on the PIP with all regards, and I also disagree. You've indicated that there were no instances noted on the PIP documents after the first week. You just told us that, I think. That's true. There are no behavior concerns noted on the PIP after the very first week. This is right around the very end of November, early December, and the point of the extension was that, look, the next rest of December, there was not a lot of activity. And something that's interesting about the auto industry in Detroit is that there's a shutdown. They actually close and go home. With all due respect, you're not focusing on the question I'm asking and giving me an answer to that. So can you answer the question? The question, as I understand it, is that if she was doing fine for a couple of weeks, why did they go out and look for complaints? Well, no, I didn't mention that. I just said if you put somebody on a performance improvement program and they do fine on it with the possible exception of the first week, you don't expect that then to result in termination. You expect it to result in her keeping her job. In this instance, the company looked for feedback, and it is true that the HR person wrote complaints. They were aggressive about doing that, weren't they? I don't think so because the key client group for this position is the sales organization. It's the sales organization that's in the very same office that she is. It's the sales organization that's been complaining for a long period of time about plaintiff. And her supervisor had noted that, well, he would coach her, she would improve for a little bit and then slip right back. They were afraid that that's exactly what happened here. And I think their concern was justified. Is it the norm in this company to put someone on a PIP before you fire them? In other words, think of it as just a procedural point. That's not the norm. The testimony is that sometimes they put people on a PIP and sometimes they do not. Sometimes they just fire them. Correct. One year earlier, Mr. Alba had fired a male employee. They put people on a PIP and let them keep their jobs if they do well? Yes. So when they solicited these comments, and whether we call them feedback, we call them complaints, were they asking the six people from whom they requested this feedback to comment on her performance during the PIP period or her entire career? Mr. Alba verbally sought feedback. His testimony was that he was asking for comments about her performance. I don't recall whether he narrowed it to that one particular time or not. But back to the question that you're being asked, if they didn't like her for whatever reason and you ask them at the end of the PIP how she was doing, if you don't ask them about how she did during the PIP, what's the point of the PIP? If they simply repeat her failures prior to the PIP, the point of the PIP being to correct those, then it seems to feed into your colleague's argument about pretext. In this instance it does not, because one of the other things they learned by soliciting feedback is that the relationship was irrevocably and unrepairably damaged. Where do we look for that in the record? It's in the comments from the sales staff that was received in response to the solicitation for feedback. So I haven't looked for that yet. The actual responses to the feedback are in the record? Yes. Where? I'm sorry, Judge, I don't know exactly where in the record. Are they exhibits to a deposition? Are they exhibits to a declaration? Where would I look for them? I'm not asking you what page they're on. I just want to know in what form we would find them in the record. Well, there's two spots. One of the sales leaders testified extensively in a deposition about the feedback, and then number two, I believe that they were exhibits attached to the record. Attached to what? Attached to the, I believe they were attached to the defendant's motion with the court below the trial court. So what do you think about the district court's decision to exclude this statement from Ms. Schroeder? I mean, doesn't Rule 801, I mean, wasn't she in a position where this was in the scope for authority? And so, you know, it's a statement of a party opponent under Rule 801. What's your take on that? I think there's another reason why it should be excluded, in addition to the statement by the trial judge, which I think is correct. The other reason is that at deposition of plaintiff, I extensively asked her for all evidence, all facts, all information, that supported her claims that discrimination was a reason for her termination. And not once did she mention the statement by Schroeder. It's now the cornerstone of her brief, and it comes in an after deposition affidavit. And I believe I extensively asked her for all evidence, and it was not provided. We closed the loop on that, and here now we have something she brings up at the last minute. And that's an additional reason why I do not think it's relevant. Well, the only rule I'm aware of about affidavits is if there's inconsistencies between a deposition and a later filed affidavit. This would not be contradictory. This would really be supplemental information. And I know of no reason that would exclude it. What rule of evidence do you think might be at play there? I don't know if any rule of evidence is called the last minute rule. I cannot point to a rule of evidence, Your Honor. But the deposition was fairly clear. We also asked her, I asked her what was discussed with ‑‑ It's possible the deposition had her focused on what was going on at the time of the firing, and this remark was two years earlier, so that makes it less relevant. But it's still relevant. I don't know why it's not relevant. Well, the other reason why it's not relevant is I think it's really critical here, which is plaintiff has admitted both in her appeal brief and at deposition that the legacies that she identifies, the salespeople, were not motivated based on her gender. They're motivated based upon the fact that she believed they wanted to dictate prices and they couldn't. That's not gender discrimination. She also identified ‑‑ The salespeople had no authority to fire her. They might have given input, but they did not have the authority to fire her. Correct? That's correct. That's correct. I think it's critical. You don't apparently do not contest that Ms. Schroeder was in a position within the company in which her comments could be attributed to the company. Is that correct? I do not dispute that. My point, again, is that the salesfolks, and by the way, in plaintiff's own brief on appeal to this court, on page 14, she specifically indicates that the salesfolks began to identify plaintiff as a problem after plaintiff refused to allow them to dictate prices. I mean, that's a clear admission in my mind that all the problems she's having with sales are associated with business issues and not associated at all with her gender in any way, shape, or form. On top of that, she does admit her deposition that the only person discriminated against her was her supervisor, Mr. Alva, and that the salesfolks treated both men and women harshly, not just women. So the focus upon somehow the salesfolks, whether their input, by the way, there's men and women in the sales team whose input was very negative towards plaintiff, is somehow tainted by discrimination. It just doesn't add up. I think it's really also important to note that Mr. Alva terminated one other person during this time frame, and that was a year earlier he terminated a male co-worker of an employee, same position. The trial court below believed that they were not comparable and did not compare them. We believe they are, in fact, comparable, that in the same, that the year earlier to plaintiff's termination. Which of the comparators is this? This is Mr. Bailey. Now, Mr. Bailey, in the same position, was rated meets on performance criteria and below expectations and behaviors. The testimony is that Mr. Alva brought in the plaintiff and rated her as meets for performance and below for behaviors. Ms. Schroeder told Mr. Alva that we can't really afford to lose two people in the same year, move one of them up. And she moved up the plaintiff, Ms. Curon, over Mr. Bailey. And as a result, Mr. Bailey was terminated. Mr. Bailey did not receive a PIP. He was simply terminated by the company. One year later, during the entire year, Mr. Alva works with plaintiff to try to improve her performance. By the way, why did he move her up? He wanted her to succeed. I think it just really dispels any idea that there was gender discrimination going on here. He spent an entire year investing and spending time. What were Bailey's problems again that led to the firing? Bailey had a review in 2014, and he had three below expectations reviews in performance and one at and one above. And he also was below with regard to his... So Bailey is not someone the plaintiff contends is a comparator. He's somebody you claim is a comparator. And Judge Murphy said that this, Tyco overstates the similarity, however, because Bailey received documented longstanding behavior and performance concerns. Giron, Giron received only negative behavior reviews. Yes. I disagree on two levels. One, the review speaks for itself, and Ms. Curon also received two. Where do we find that in the record? The review is in the record. Of Mr. Bailey? Of Mr. Bailey, yes, it is. And I do not have it here in front of me. I don't care so much. It is in the record. I'm not asking you what page it's on. Just tell me. It was attached as an exhibit to defendant's reply brief to the trial court below. But it sounds like... Is it just the review, or is it properly authenticated? There's an affidavit attached to the review. But it does sound to me like the record shows that Bailey's problems were worse than the plaintiff's problems. Mr. Alva does testify when asked about Bailey that he had performance problems and behavior problems. That's two is worse than one, right? Well, the record, I think the document speaks for itself. At that moment, there's not a full airing at the position. I'm just saying, I'm not sure which way it cuts. But it does make sense that Bailey might be the one that's fired without a PIP, and that she would get warned, have the PIP. I mean, that's all that's going on in my head. I'm just trying to make sure I'm understanding it. Well, the review for both was meets expectations for performance and below expectations for behaviors. Garan was moved up to meets for both. And so, yes, there were concerns about his performance, but he was at meets expectations for performance in his review. And so was plaintiff, exactly the same. There are some notations. Well, that's not really what Judge Murphy said. Now, he may have been in error, but in footnote three on page seven, it says, Bailey received documented longstanding behavior and performance concerns. And there weren't any performance concerns with respect to Garan. And we can find these sites in footnote three and six, I think, answers the questions about where you find these things. I believe that Judge Murphy was mistaken in that conclusion. The other reason why I think it's really relevant here is that we point in our brief to Douglas v. Eaton Corporation. And the requirement of comparability is something that's been developed to address pretext for plaintiff to prove that perhaps that gender was at work. I don't believe that same standard really should apply when defendant is pointing out that, hey, look, we've treated other people who are pretty much the same as you more harshly or the same as you. Mr. Bailey was at the same review level. Your time is up. Thank you. Rebuttal. Thank you. The contention that during the first week of the PIP there were some sort of behavioral issues, this is what the PIP documented. There have been no concerns expressed by any team member. Vicki needs to ensure this is maintained going forward. That's what it said. Mr. Elva admitted at his deposition that at the end of the original PIP, this eight-week PIP, there were really no issues. Vicki had no issues. One other point on pretext. As far as the feedback solicited, there was a feedback packet that was put together. Part of this packet included e-mails going back two years authored by a Ms. Predke who hadn't even worked with Ms. Iran since that time. I think that's compelling evidence of pretext. As far as Ms. Schroeder, Ms. Schroeder submitted an affidavit through counsel in this case. She had every opportunity to refute these gender-based comments attributed to her by my client in my client's declaration. She didn't refute any of that, so that's uncontested. One other point about Mr. Elva and his treatment and respect or lack thereof for women, and this is in the record. He was in a meeting with a high-level finance director, former finance director at Tyco, a female. Presumably, she knew a little bit about accounting practices. A discussion arose about some calculations he was presenting, and she asked him to clarify it. He blurted out in this meeting with all these high-level executives, it's just stupid math. Just do the stupid math. That is an example of Mr. Elva's treatment toward women, including high-ranking women in the workplace. Could I ask you about Schroeder? Sure. I don't want you to think I'm making a big deal of this. Whether you did or didn't take her deposition, I don't think is dispositive on that admissibility question one way or the other. I'm just curious. Why didn't you take Schroeder's deposition when you seem to be relying upon Schroeder? Well, Ms. Schroeder is, I think she's out of state. That's not prohibitive. I could have brought her in, but she's still with the company, Judge. I find it very difficult to have high-level current employees come in and say, oh, yes, my bad, this was gender discrimination. So I got the same information in through my client because it's an admission. All right. Ms. Schroeder. Just a strategic decision. Yes, yes. That's fine. I was just curious. In 2017, Ms. Schroeder is, via her declaration, saying things completely at odds with what she said at the time. I want to just briefly, if I could, address a passage from Price Waterhouse, which is, I think, very apt in this case. You know, this is a seminal gender discrimination case. Maybe one sentence. Your time is up. The court in that case recognized the intolerable and impermissible catch-22 of an employer who objects to aggressiveness in women, but whose position requires those traits. This was a very high-demanding, difficult job my client had. She had to coordinate all kinds of members, but she wasn't a manager. In other words, she didn't have technical authority over anybody. So tons of responsibility. We got the point. No authority. Thank you. We thank you both for your argument. We'll consider the case carefully.